# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

---

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

January 17, 2012

By E-Mail and Hand Delivery
Victoria M. Aguilar
United States Probation Officer
Eastern District of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

**Re: United States v. William Soler, 10-CR-708 (RJD)**

Dear Ms. Aguilar:

I write to set forth the defense's objections and/or corrections to the Presentence Investigation Report ("PSR"). These objections relate to the descriptions of some of the offense conduct in this case, and to the corresponding Guideline enhancements based on certain specific offense characteristics.

The Offense Conduct

In **paragraph 3**, it states that Mr. Soler's codefendant, Sami Waters, forced Yana Bromberg "out of the bedroom and *down the stairs* at gunpoint" and that *as they "made their way down the stairs*, they encountered Ms. Bromberg's mother, who attempted to spray Windex in Waters' eyes in an effort to resist" (PSR ¶3) (emphasis added). In response, Waters struck Ms. Bromberg's mother (Vera Bromberg) in the head with his gun, causing her to fall down the stairs, where she collapsed (*id.*).

Yana Bromberg's trial testimony, however, was that she and Waters encountered her mother at the top of the stair case, *before* they walked down the stairs and as her mother was walking up the stairs: "With his hand he grabbed me around the waist and told me to let's move out of the room and *we started walking towards the staircase* of my house. ... Once we got to the staircase, *that's when I noticed my mom was making her way up the stairs and that's when she saw him and she started just yelling and screaming* and I was telling her in Russian to be quiet

and just, you know, follow his orders" (Tr. 41, 42).[1] Her mother continued screaming, tried to spray Waters in the eyes with the Windex, and he hit her in the head with his gun, causing her to stumble down the stairs and eventually collapse at the bottom (Tr. 43). As "she was stumbling down," Yana Bromberg testified, "he was nudging me to come downstairs," and she did (Tr. 43). Thus, Sami Waters encountered and assaulted Ms. Bromberg's mother *before* he and Yana Bromberg made their way downstairs, where William Soler was watching Yana's father Alexander Bromberg (PSR ¶4).

In **paragraph 4**, it states that, after ordering the Brombergs to line up on the floor, "The *two men* then asked, 'which one of you wants to die first?'" (PSR ¶4) (emphasis added). When asked if she remembered which of the two men said that, however, Vera Bromberg clarified that it was *Sami Waters* (Tr. 45), and confirmed this on cross-examination, as well (Tr. 122).

In **paragraph 7**, it states that "Upon being asked, Ms. Bromberg *confirmed for Waters and Soler* that the white Honda Accord parked outside in front of the residence belonged to her" (*Id.* ¶7) (emphasis in italics added). According to the trial testimony, however, the person who asked about the car parked outside was *Waters* (Tr. 78). Specifically, he asked, "Is that your car outside" and she said, "Yes," and he demanded and was given the keys (Tr. 51, 78).

In **paragraph 8**, it states that before leaving the house, "*one of the defendants* stated, "Just remember, if we get caught, we know people" (*id.* ¶8) (emphasis added). Ms. Bromberg further indicated, however, that the one who said this, as well, was Sami Waters: "I can't exactly remember but based on who was aggressive the whole time, I would say that it was the shorter man" [*i.e.,* Waters) (Tr. 53). Similarly, Ms. Bromberg testified that Waters appeared to be leading the entire robbery and did most of the talking throughout the incident, and that Soler did not speak much (76).

In **paragraph 11**, it states, "In Water's backpack officers recovered batting gloves, a mask, handcuffs, a lock punch, and a shank. *Two police scanners* tuned to the radio frequency of the police precinct where the Bromberg's house is located *were also found in the defendants' possession*" (PSR ¶11) (emphasis added).

The police scanners, too, however, were recovered from *Sami Waters alone, specifically from Waters's backpack* (Tr. 157-58, 159-62, 167). The police scanners were not recovered from William Soler (Tr. 179-80). In fact, the only items seized from his backpack were a glove and face mask, a cell phone, a stuffed animal, some clothes, and some house keys that had no connection to the crime (Tr. 179-81).

In **paragraph 13**, it states that Soler told police that he and Waters escaped from the Bromberg's house in "a white car which they parked a few blocks away from the arrest." Soler, however, did not tell the police that they left the scene in a car they had parked. According to Detective Madera, Soler told the police that Waters drove them to the area in Waters' car and

---

[1]Parenthetical references preceded by "Tr." are to page numbers of the trial transcript.

that after leaving the house they "jumped into a white car" and drove away (Tr. 276, 277, 289-90).  According to Police Officer Grant, Soler told him and Madera that after he walked out of the house, he looked around "and then heard Sami Waters whistle and direct him to get into a white car" (Tr. 305).

Guideline Enhancements Based on Specific Offense Characteristics

The defense also objects to the following proposed enhancements of the base offense level based on certain specific offense characteristics the PSR found applicable in this case.

– 2-level enhancement because a threat of death was made (PSR ¶¶ 15, 16, 22, 32)

– 2-level enhancement because a victim sustained physical injury (PSR ¶¶ 15, 16, 23, 33)

– 1-level enhancement because the loss exceeded $10,000 (PSR ¶¶ 15, 16, 25, 35)

The Bodily Injury, Threat of Death and Theft of Jewerly is Not Part of the Offense Conduct with Respect to the Carjacking

These enhancements should not apply first because the underlying acts that would trigger them did not occur during the commission of the carjacking.  With exceptions not applicable here for certain "groupable" offenses[2], these and other specific offense characteristics "shall be determined on the basis of [] acts and omissions [] that occurred *during the commission of the offense of conviction*, in preparation for *that offense*, or in the course of attempting to avoid detection or responsibility for *that offense*," as well as harm that resulted from, or was the object of, such acts and omissions.  U.S.S.G. §§ 1B1.3(a)(1)(A), 1B1.3(a)(3).

Here, "the offense of conviction" for these purposes was carjacking.  The "carjacking" in this case was committed when the codefendant, Sami Waters, demanded and took the Brombergs' car keys and drove off in their car with Mr. Soler at the conclusion of a home

_____

[2] *"[S]olely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts,"* specific offense characteristics shall be determined also on the basis of acts and omissions that were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §1B1.3(a)(2). Section 3D1.2(d), however, specifically excludes Section 2B3.1, the robbery guideline, from its operation. *See also* Guideline 1B1.3, App. Note 10 (In contrast to a drug distribution case, which is groupable under Section 3D1.2(d) so that quantities and types of drugs not specified in the count of conviction are nonetheless to be included in determining the offense level if part of the same course of conduct or common scheme of plan, "in a robbery case in which the defendant robbed two banks, the amount of money taken in one robbery would <u>not</u> be taken into account in determining the guideline range for the other robbery, even if both robberies were part of a single course of conduct or the same scheme or plan").

invasion robbery that was not the subject of any federal charges. Though the car keys were taken at gunpoint, the threat of death and the physical injury (to Vera Bromberg) did not occur during the commission of the carjacking. Instead, both of these things, as well as the taking of the (over $10,000 of) jewelry occurred beforehand, during the commission of the uncharged home invasion robbery. While these specific offense characteristics might apply if Mr. Soler had been charged with and convicted of a federal "Hobbs Act" robbery for the home invasion, that does not mean they can be used to enhance the guideline range for the subsequent car theft committed without bodily injury or a threat of death.

Nor did the threat of death, the bodily injury, or the taking of the jewelry occur "in preparation for" or "in the course of attempting to avoid detection or responsibility for" the car jacking. U.S.S.G. §1B1.3(a)(3). On the contrary, at the time those acts were committed, the only apparent objective was to get cash and jewelry, and the defendants did not know or ask about the car until afterwards, when they were about to leave. As Judge Dearie himself noted during a pre-charge conference after the close of the evidence, the "car jacking" here appeared to be "an afterthought. What was going on here wa a robbery" – "essentially a state crime that's been shorn into a federal crime" – after which "one of the defendants just decided to take the car" (Tr. 312). The fact that evidence of this earlier uncharged conduct was introduced as background at Mr. Soler's trial on the carjacking does not make it "offense conduct" or allow it to enhance the Guideline range for the carjacking by resort to aggravating offense characteristics that did not occur during its commission.

As these three specific offense characteristics do not apply, the adjusted offense level should be 22, which corresponds to a Guideline range of 51 to 63 months for the carjacking and felon-in-possession offenses.

<u>Waters' Conduct in Physically Injuring and Threatening to Kill Victims Should Not Enhance Soler's Offense Level Because it Was Not Within the Scope of the Specific Conduct Soler Agreed to Jointly Undertake</u>

Even if these acts had occurred during the commission of the carjacking, the "threat of death" and "bodily injury" enhancements should not apply also because they should not be attributed to Mr. Soler for Guideline purposes. The 2-level threat enhancement is warranted, the PSR concludes, because "**Soler** threatened the victim with death" (PSR ¶¶ 15, 16). As noted in our factual objections, however, it was *Waters, not Soler*, who threatened the victim with death. Soler, if anything, tried to mollify those threats, by reassuring Yana Bromberg, when he was alone with her, that she was not going to be harmed.

As the PSR's proposed enhancement for this threat appears to be premised on the erroneous conclusion that Mr. Soler committed or aided this act, that 2-point enhancement should be removed.

Nor should that enhancement, or the enhancement for the bodily injury Waters caused by hitting Yana Bromberg's mother with his gun, be included as the result of "reasonably foreseeable

acts and omissions of others in furtherance of" a "jointly undertaken criminal activity" under Guideline Section 1B1.3(a)(1)(B).  "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement*)."  *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995), quoting U.S.S.G, §1B1.3, App. Note 2 (1993) (emphasis in *Studley*).

Here, the scope of the specific conduct and activity this particular defendant agreed to jointly undertake is best understood by looking at what he and Waters discussed before and during the robbery.  In this regard, the PSR recounts, Waters approached Soler and "told him to bring his (**Soler's**) gun because 'he might need to scare someone'" (PSR ¶13).  Having specifically agreed to bring a gun in case he might need to scare someone, Mr. Soler did not agree to jointly undertake activities that included using a gun to strike a victim in the head, an act that, significantly, occurred outside his presence and knowledge while he was downstairs with another victim.  Attesting to this, and demonstrating that this act by Waters was beyond the scope of the specific conduct embraced by their agreement, Mr. Soler panicked when it happened, throwing ice to the victim's husband to apply to her bleeding head and pleading with Waters to end the robbery and leave the premises (PSR ¶5).  Waters' retort that they "have to finish" and his response of sending Soler upstairs to get more loot further illustrates a disconnect between the two men, if anything, about "the scope of the specific conduct and objectives embraced by the defendant's agreement." *United States v. Studley*, 47 F.3d at 574.  For similar reasons, it cannot be said that Waters' repeated violent forays beyond the scope of the agreement would have been "reasonably foreseeable" to Soler.

Accordingly, Mr. Soler's base offense level should not receive 2-level enhancements for Mr. Waters' conduct in causing bodily injury or making a threat of death.

Thank you for your consideration.

Very Truly Yours,

Kannan Sundaram
Assistant Federal Defender
(718) 330-1203

cc:   AUSA Richard M. Tucker
      AUSA William D. Sarratt
      AUSA Shreve Ariail

      Clerk of Court (RJD)